UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
RONIT MENASHE and AUDREY QUOCK,           :
                                          :     05 Civ. 239 (HB)
                Plaintiffs,       :
                                          :     OPINION, ORDER, &
                v.                :     <u>JUDGMENT</u>
                                          :
V SECRET CATALOGUE, INC.,                 :
VICTORIA'S SECRET STORES, INC.,           :
INTIMATE BEAUTY CORPORATION               :
d/b/a VICTORIA'S SECRET BEAUTY, and       :
VICTORIA'S SECRET DIRECT, LLC,            :
                                          :
                Defendants.       :
------------------------------------------------------------------x
**Hon. HAROLD BAER, JR., District Judge:**

## I. BACKGROUND

On January 11, 2005, Ronit Menashe ("Menashe") and Audrey Quock ("Quock") (together "Plaintiffs"), filed this declaratory judgment action for non-infringement of the trademark "SEXY LITTLE THINGS" (the "Mark") under the Lanham Act, 15 U.S.C. § 1051 <u>et. seq.</u>, and at common law against Defendants V Secret Catalogue, Inc., Victoria's Secret Stores, Inc., Intimate Beauty Corporation, and Victoria's Secret Direct, LLC (collectively "Victoria's Secret"). Plaintiffs also sought a declaratory judgment of non-cybersquatting under the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), a judgment of tortious/fraudulent misrepresentation, punitive damages, and reasonable attorney's fees.

On July 7, 2005, this Court denied Victoria's Secret's motion to dismiss the Complaint pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative for summary judgment. <u>Menashe v. V Secret Catalogue, Inc.</u>, No. 05 Civ. 239, 2005 WL 1580799 (S.D.N.Y. July 7, 2005). Trial was held on December 13-14, 2005.

## II. FINDINGS OF FACT

### A.    <u>Plaintiffs' Adoption of the Mark</u>

On or about June 1, 2004, Menashe, a publicist, and Quock, a fashion model and actress, embarked on a joint business venture to produce and launch a line of women's underwear. Trial Declaration of Ronit Menashe ("Menashe Decl.") (undated) ¶¶ 4, 6; Trial Declaration of Audrey

1

Quock ("Quock Decl.") (undated) ¶¶ 3, 5.  Sometime in July 2004, they decided to name their line "SEXY LITTLE THINGS."  Menashe Decl. ¶ 7; Quock Decl. ¶ 11.  Also in July 2004, Quock purchased 400 sample pieces of plain stock underwear from a manufacturer in China and in late July or early August 2004, heat pressed her designs consisting of words and logos onto the stock underwear.  Quock Decl. ¶¶ 7, 13.  She also heat pressed the Mark onto the back of the underwear where a label would normally be attached.  Id.

In late July or early August 2004, Menashe and Quock came up with the phrase "SEXY LITTLE THING, SEXY LITTLE THINGS," a variation of their chosen name that they believed yielded many creative possibilities for design and advertising.  Menashe Decl. ¶ 8; Quock Decl. ¶ 12.  On August 31, 2004, Quock registered the domain name www.sexylittlethings.com in preparation for building a website to sell the underwear line over the Internet.  Quock Decl. ¶ 18.  Subsequently, on September 13, 2004, after searching the website of the United States Patent and Trademark Office ("USPTO") and finding that the Mark was available, Menashe and Quock filed an intent-to-use ("ITU") application with the USPTO for "SEXY LITTLE THING, SEXY LITTLE THINGS" for lingerie.  Menashe Decl. ¶ 9-10; Quock Decl. ¶ 20.  About ten days later, Quock hired a website designer to create the www.sexylittlethings.com site.  Quock Decl. ¶ 21.

By early September 2004, Quock initiated negotiations with her manufacturer in China to silkscreen print her designs on bulk shipments of underwear.  Id. ¶ 24.  In October 2004, she sent the manufacturer eight designs to make prototype prints, and started negotiations for an order of 6,000 pieces of underwear.  Id. ¶ 24, 26.  The manufacturer sent Quock the eight prototypes on November 13, 2004.  Id. ¶ 28.  By then, she had also sent the manufacturer diagrams for the production of labels carrying the mark "SEXY LITTLE THINGS."  Id.

Meanwhile, Plaintiffs had also set about publicizing their line.  Sometime in September or October 2004, Quock did an interview with www.ediets.com, and an article that mentioned the name of Plaintiffs' line and the www.sexylittlethings.com website appeared online at the ediets.com website in the week of November 19, 2004.  Id. ¶ 34.  On August 19, 2004, Quock did a photo shoot for Stuff Magazine in which she modeled a pair of "SEXY LITTLE THINGS" underwear.  Id. ¶ 31.  The photographs were published in Stuff Magazine in March of 2005 with an accompanying article that featured Quock's venture into women's lingerie, but did not mention the name of the line.  Id. ¶¶ 32, 47.  In late September or early October 2004, Quock did an interview with Beyond Fitness magazine in which she promoted her underwear line, but was

unaware whether the article was ever published.  Id. ¶ 38; 12/13/2005 Trial Transcript ("Tr.") at 48-49.  In mid-November, she flew to Milan for a photo shoot featuring "SEXY LITTLE THINGS" underwear.  Quock Decl. ¶ 40.  The photographs were never published.  Tr. at 51-53.

On October 14, 2004, Quock e-mailed Menashe an outline of a business plan for the underwear line and indicated that they were ready to seek buyers.  Quock Decl. ¶ 37; 10/14/2004 e-mail from Quock to Menashe, Plaintiffs Trial Exhibit ("Pls. Ex.") 14.  Sometime in November 2004, Quock contacted a friend who was a buyer for Fred Segal stores about selling the underwear line in boutiques in Los Angeles, California.  Quock Decl. ¶ 39; Tr. at 44.  As noted below, this effort too was never consummated.

On November 16, 2004, Menashe received a letter from Victoria's Secret's outside counsel informing her that Victoria's Secret had been using "SEXY LITTLE THINGS" as a trademark for lingerie since prior to the filing date of Plaintiffs' ITU application.  Menashe Decl. ¶ 12; see 11/15/2004 Cease and Desist Letter, Ex. A to 03/14/2005 Am. Compl., at 1.  The letter warned that "SEXY LITTLE THING, SEXY LITTLE THINGS," the subject of Plaintiffs' ITU application, was confusingly similar to Victoria's Secret's mark and, if used, would constitute trademark infringement.  See id. at 2.  Further, the letter demanded that Plaintiffs cease and desist all plans to use "SEXY LITTLE THING, SEXY LITTLE THINGS," abandon their ITU application, and transfer the domain name www.sexylittlethings.com to Victoria's Secret.  See id.  Finally, the letter requested a response by November 19, 2004.  See id.

Victoria's Secret's letter caused Plaintiffs to halt production of their underwear project, instruct Stuff Magazine not to mention the name of their underwear line, discontinue other publicity efforts, stop development of their website, and cease their attempts to find retail outlets for their product.  Quock Decl. ¶¶ 44, 46, 50.  Plaintiffs also ordered two trademark investigations into Victoria's Secret's claims to the Mark.  Id. ¶ 52.  They were informed that no one had used the Mark prior to the filing of their ITU application.  Id.  One investigation reported that Victoria's Secret's Resort 2005 catalogue, which had been sent with the cease and desist letter as proof of Victoria's Secret's use of the Mark, was not mailed out until December 28, 2004.  Id. ¶ 53.  At trial—while it stretches credulity—Menashe testified that since the time she received the cease and desist letter, she has not been in a Victoria's Secret store or looked at a Victoria's Secret catalogue to see whether Victoria's Secret was selling merchandise under the name "SEXY LITTLE THINGS."  Tr. at 64-65.  Quock testified that she did not visit a

Victoria's Secret store nor look at a Victoria's Secret catalogue until some time after receipt of the cease and desist letter, when she walked into a Victoria's Secret store and saw a display for "SEXY LITTLE THINGS." Tr. at 54-55.

### B. Victoria's Secret's Adoption and Use of the Mark

As early as Fall 2002, Victoria's Secret began to develop the concept and marketing for a panty collection. Tr. at 207. Victoria's Secret's decision to expand its panty business stemmed from a desire to capitalize on a major fashion trend that appeared to herald "decorated bottoms"—seen in the popularity of low rise pants and the vogue among young women for wearing lingerie style items as outerwear. Tr. at 206. Sometime between March 30 and June 1, 2004, Victoria's Secret's marketing department settled on the name "SEXY LITTLE THINGS" for its panty collection. Tr. at 181, 185. The collection, characterized as "fun, flirty, and playfully sexy," was designed to appeal to women in their twenties and early thirties, and was comprised of over eighty items that included panties, camisoles, and other underwear. Tr. at 184, 196; Sexy Little Things Brand Strategy, Defendants Trial Exhibit ("Defs. Ex.") K. Some of these items were already being sold in Victoria Secret stores as general merchandise prior to the introduction of the "SEXY LITTLE THINGS" collection (the "Collection"), but the majority of the items were placed in stores for the first time when the Collection was rolled out in July 2004. Tr. at 186-87.

On or around July 28, 2004, the Collection was scheduled to make its first appearance in five Victoria's Secret stores in Ohio, Michigan, and California. 12/01/2005 Trial Declaration of Pamela K. Rice, Director of Merchandising for Sexy Little Things for Victoria's Secret Stores, Inc. ("Rice Decl.") ¶ 7. On that date, the mark "SEXY LITTLE THINGS" was displayed with the Collection in four of the five stores in the form of hangtags, store signage, permanent fixtures, or in window exposures. Id. ¶ 8. For example, in one of the Ohio stores, denominated Easton #1300, the Mark appeared as a large illuminated sign on a "focal wall," a specially constructed vertical unit of nine compartments, each compartment containing a plastic "buttock" on which a pair of panties was displayed. See Defs. Ex. D, VS 732. In that store, the Mark also appeared prominently on hangtags attached to hangers that displayed panties, on labels adhered to pull-out compartments of something called a "panty bar"—a horizontal case that displayed merchandise in each compartment—and with window displays of the same merchandise. Id., VS 728-29, 738, 745-46, 749-50. Further, on July 28, 2004, the testimony recites that the "selling

environments" for "SEXY LITTLE THINGS" merchandise, comprising the various described displays, opened to consumers in the Ohio roll-out stores. Rice Decl. ¶ 9; 11/30/2005 Trial Declaration of Polly Jean Sinesi, Director of Prototype Design for Limited Store Planning, Inc. ("Sinesi Decl.") ¶ 13.

The roll-out at the Briarwood, Michigan store was delayed owing to technical difficulties related to signage. Tr. at 177-78. Maria Thurston, a co-manager of the Briarwood store from October 2001 until November 27, 2004, testified that while construction for a "panty boutique" was completed on July 28, 2004, no "SEXY LITTLE THINGS" signs appeared in the store until the second week of September 2004. Trial Declaration of Maria E. Thurston, Former Co-Manager of Victoria's Secret Briarwood Store #105 ("Thurston Decl.") (undated), ¶¶ 6-9. Ms. Thurston also testified that through September 2004, she never received brand guides from corporate headquarters with instructions for displaying "SEXY LITTLE THINGS" merchandise in the store. Tr. at 80-81.

The "SEXY LITTLE THINGS" collection was rolled out to more Victoria's Secret stores in September and October 2004, and by October 19, 2004, the Collection was available to consumers in all nine hundred and twenty-three Victoria's Secret retail lingerie stores nationwide. Rice Decl. ¶¶ 11-13. In each of the stores, there was some form of focal wall or table signage that displayed the "SEXY LITTLE THINGS" mark together with garments from the Collection. Tr. at 178, 196. No labels displaying the Mark were sewn on the merchandise, however, until June 2005. Tr. at 195-96, 199. Moreover, when the Collection was rolled out, store receipts did not indicate that the consumer had bought a "SEXY LITTLE THINGS" item. Tr. at 211.

The Collection was also available to consumers through catalogues and online. The Collection, according to the uncontradicted testimony and exhibits, first appeared in the Major Fall 2 edition of the Victoria's Secret catalogue that was mailed out to approximately 2.9 million consumers nationwide between September 4, 2004 and September 9, 2004. 11/30/2005 Trial Declaration of James J. Pozy, Controller of Victoria's Secret Direct, LLC ("Pozy Decl.") ¶¶ 6, 9. Because Victoria's Secret Direct simultaneously makes most of its catalogues available online through its website, the Major Fall 2 catalogue became available online on or about September 9, 2004. Id. ¶ 7. Beginning with the Major Fall 2 edition, the Collection has appeared in approximately twenty-two editions of the Victoria's Secret catalogue. Id. ¶ 14.

Typically, the catalogues contained several pages dedicated to the display of "SEXY LITTLE THINGS" merchandise. Copies from Victoria's Secret Catalogues, Defs. Ex. BB. The Mark was prominently displayed on these pages together with "SEXY LITTLE THINGS" items. Occasionally, together with "SEXY LITTLE THINGS" merchandise, these pages also displayed a few items from Victoria's Secret's other trademarked collections, sub-brands such as Angels by Victoria, Body by Victoria, and Very Sexy, so as to suggest to the consumer various looks that could be created using pieces from different collections. Tr. at 242-43, 245-46, 248, 250. When this happened, the catalogue copy stated the name of the collection to which the item belonged. Tr. at 260. In addition, a few items advertised as part of the "SEXY LITTLE THINGS" collection were advertised in other editions of the catalogue as part of another trademarked collection or simply as general merchandise not belonging to any particular collection. Tr. at 239-41, 250-51.

In the period July 31, 2004 through November 19, 2005, Victoria's Secret sold over thirteen million units of "SEXY LITTLE THINGS" merchandise for total sales of $119,052,756. 11/30/2005 Trial Declaration of Joseph Hippler, Controller of Victoria's Secret Stores, Inc. ("Hippler Decl."), ¶ 9. The "SEXY LITTLE THINGS" brand accounted for approximately 4% of Victoria Secret Stores' total company sales for fiscal year 2005. Id. ¶ 10.

On November 11, 2004, Victoria's Secret applied to register "SEXY LITTLE THINGS" for lingerie on the USPTO's Principal Register based on first use in commerce dating from July 28, 2004. See Victoria's Secret's Trademark Application File Wrapper, Defs. Ex. II. At about this time, Victoria's Secret learnt of Plaintiffs' ITU application for "SEXY LITTLE THING, SEXY LITTLE THINGS" and of their registration of the domain name www.sexylittlethings.com. See 11/15/2004 Cease and Desist Letter, Ex. A to 03/14/2005 Am. Compl., at 1. On November 15, 2004, as recounted in Section II.A supra, Victoria's Secret's outside counsel sent Plaintiffs a cease and desist letter. Id.

On March 28, 2005, the USPTO suspended further action on Victoria's Secret's trademark application pending the disposition of Plaintiffs' ITU application. See Victoria's Secret's Notice of Opposition to Plaintiffs' Trademark Application, Defs. Ex. JJ, at 2-3. On September 13, 2005, the USPTO published Plaintiffs' ITU application for opposition in the Official Gazette. See id. at 2. Victoria's Secret filed its notice of opposition to Plaintiffs' application on September 30, 2005, on the grounds that Victoria's Secret has priority of use as to

the Mark, and that registration of Plaintiffs' "SEXY LITTLE THING, SEXY LITTLE THINGS" mark for identical goods would be likely to cause consumer confusion. See id. at 3-5. That action is still pending before the Trademark Trial and Appeal Board ("TTAB"). Tr. at 6. On January 11, 2005, Plaintiffs filed the instant action for declaratory judgment of trademark non-infringement.

### III.  CONCLUSIONS OF LAW

#### A.  Subject Matter Jurisdiction

Victoria's Secret contends that this Court lacks subject matter jurisdiction on two grounds:  (i) ITU applicants have no standing to bring civil actions prior to registration; and (ii) the jurisdictional requirements of the Declaratory Judgment Act are not met because there is no actual case or controversy presented.  Victoria's Secret previously raised these arguments in its motion to dismiss the Complaint, and because I assume familiarity with my discussion of these issues in my July 7, 2005 decision denying Victoria's Secret's motion, I address these arguments again only briefly.  See Menashe v. V Secret Catalogue, Inc., No. 05 Civ. 239, 2005 WL 1580799 (S.D.N.Y. July 7, 2005) (Baer, J.).

##### 1.  Standing of ITU Applicant to Bring Civil Action

Plaintiffs concede that ITU applicants have no Lanham Act rights to bring an offensive action in federal court—i.e., to charge another party with infringement—but argue that they may defend against claims of infringement by another party.  Plaintiffs contend that by bringing a declaratory judgment action for non-infringement, they are acting defensively.

In my July 7, 2005 decision, I held that the Second Circuit's decision in WarnerVision Entertainment Inc. v. Empire of Carolina, Inc., 101 F.3d 259 (2d Cir. 1996), may be read to allow an ITU applicant to preemptively file an action for declaratory judgment of non-infringement.  See Menashe, 2005 WL 1580799, at *7.  In that case, WarnerVision had sued Empire for trademark infringement.  Empire argued that its predecessor in interest had filed an ITU application prior to WarnerVision's use of the contested mark, and hence Empire should not be enjoined from using the mark and completing the ITU registration process.  See WarnerVision, 101 F.3d at 261.  The Second Circuit agreed that Empire could assert the ITU filing to defend against WarnerVision's efforts to prevent it from completing the ITU registration process.  See id.  The Circuit reasoned that enjoining Empire from using the mark, and hence achieving registration, would defeat the very purpose of the ITU provisions, which are to allow

7

an applicant time to make the use of a mark necessary for registration. See id. at 262. In my July 7, 2005 decision, I extended the Circuit's reasoning to allow Plaintiffs here to preemptively defend against Victoria's Secret's efforts to prevent them from completing the ITU registration process. See Menashe, 2005 WL 1580799, at *7.

Victoria's Secret attempts to distinguish WarnerVision from the instant case in two ways. First, Victoria's Secret argues that in WarnerVision, the ITU applicant was the defendant, not the plaintiff. Second, and more important, Victoria's Secret asserts that in WarnerVision, the party that sought to prevent the ITU applicant from completing its registration process began use of the contested mark only after the ITU filing date whereas here, Victoria's Secret used the Mark before Plaintiffs' ITU filing. As further discussed at Section III.B.2 infra, Victoria's Secret argues that its use-based rights to the Mark trump any constructive use rights Plaintiffs may attain by completing the ITU registration process.

Victoria's Secret's first argument failed to convince me before, and fails to convince me now. Plaintiffs do not seek to prevent Victoria's Secret from using the Mark, but rather request a ruling that they may use the Mark without incurring liability for infringement so as to complete the registration process. The formalities of case caption nomenclature should not be elevated over the substance of Plaintiffs' position.

Victoria's Secret's second argument based on its use of the Mark before Plaintiffs' ITU filing would be persuasive if its claim of prior use were unquestioned. To the contrary, however, Plaintiffs challenge Victoria's Secret's priority. Plaintiffs assert that even if Victoria's Secret commenced use of the Mark before Plaintiff's ITU filing, the Mark is descriptive or, in the alternative, Victoria's Secret used the Mark in a descriptive manner, and therefore Victoria's Secret is not entitled to priority without proof that the Mark had acquired secondary meaning by the time Plaintiffs filed their ITU application. If Plaintiffs are correct, then the constructive use rights they would obtain as a result of achieving registration would trump Victoria's Secret's claims to the Mark. Accordingly, Plaintiffs are at least entitled to the opportunity to prove, as part of their prayer for a declaratory judgment of non-infringement, that the Mark is descriptive or was used descriptively and had failed to achieve secondary meaning by the time they filed their ITU application.

Finally, policy considerations are important here, especially the promotion of certainty in business transactions by fixing an applicant's priority right as of the date of its filing an

application, and the encouragement and reward of early filing so as to put claims to marks on the public record as soon as possible. See S. Rep. No. 100-515, at 29-30 (1988). If I declined to hear this case for lack of subject matter jurisdiction, Plaintiffs would be faced with the hard choice of abandoning their application or attempting to complete the registration process and, in so doing, risk liability for infringement. This predicament would neither promote commercial certainty nor reward early filing.

### 2.     Jurisdiction Under Declaratory Judgment Act

Victoria's Secret next contends that this Court lacks subject matter jurisdiction under the Declaratory Judgment Act because there is no actual case or controversy presented. Victoria's Secret asserts that discovery has revealed that Plaintiffs made only a small monetary investment in their business venture and had no evidence that their proposed lingerie line was ready to be sold to the public. Plaintiffs counter that Victoria's Secret's cease and desist letter caused them reasonably to fear liability for infringement, and that when they received the letter, they were virtually about to launch their line.

The test for an actual case or controversy in trademark actions is two pronged: (i) has the defendant's conduct created a real and reasonable apprehension of liability on the part of the plaintiff; and (ii) has the plaintiff engaged in a course of conduct which has brought it into adversarial conflict with the defendant. See Starter Corp v. Converse, Inc., 84 F.3d 592, 595 (2d Cir. 1996). An indirect threat of suit is sufficient to satisfy the first prong. See Muller v. Olin Mathieson Chem. Corp., 404 F.2d 501, 504 (2d Cir. 1968).

The court in Cargill, Inc. v. Sears Petroleum & Transport Corp., a declaratory judgment action for patent infringement, found a real and reasonable apprehension of liability on facts very similar to those here. See id., No. 02 Civ. 1396, 2002 WL 31426308 (S.D.N.Y. Oct. 28, 2002); see also Starter Corp., 84 F.3d at 592 (noting that declaratory judgment actions involving trademarks are analogous to those involving patents). In Cargill, the declaratory defendant had sent the declaratory plaintiff a cease and desist letter through its outside attorney that implied it would sue for patent infringement and gave the defendant only a short period of time to respond. See Cargill, 2002 WL 31426308, at **3-4. Additionally, the defendant had informed the plaintiff's distributor and customer that there was a pending lawsuit between the parties. See id. All factors but the last are present here. Victoria's Secret sent its cease and desist letter to Plaintiffs through its outside counsel. The letter warned that "SEXY LITTLE THING, SEXY

9

LITTLE THINGS" was confusingly similar to "SEXY LITTLE THINGS" and, if used, "would constitute trademark infringement" and "false designation of origin" in violation of the Lanham Act and common law. 11/15/2004 Cease and Desist Letter, Ex. A to 03/14/2005 Am. Compl., at 2. The letter continued that use of their mark "may subject [Plaintiffs] to Victoria's Secret for an injunction, profits, damages and attorneys' fees and costs." Id. This language may reasonably be read as a thinly veiled threat to sue for trademark infringement should Plaintiffs commence use of their mark. Finally, the letter gave Plaintiffs only three days from the date of receipt to respond. See id. In light of the totality of the circumstances, including the David and Goliath fact pattern present here, Victoria's Secret's letter fairly created a real and reasonable apprehension of liability on the part of Plaintiffs.

As to the second prong, Plaintiffs must show that they had taken specific steps and had a concrete intention to use their mark. See Starter Corp., 84 F.3d at 597. Plaintiffs testified at trial that they had purchased 400 sample pieces of stock underwear from a manufacturer in China and had arranged with the manufacturer to produce samples of their lingerie. Plaintiffs had also started negotiations for silkscreen printing of bulk shipments of underwear. Further, Plaintiffs testified and submitted documentary evidence that they had engaged in publicity to promote their line, had engaged a website designer to build their site, and had contacted a retailer about selling their underwear in its stores. These specific steps are more than sufficient for me to conclude that Plaintiffs had a concrete intention to use their mark, and support my determination that Plaintiffs had engaged in a course of conduct that put them in adversarial conflict with Victoria's Secret. Accordingly, Plaintiffs have satisfied both prongs of the test for an actual case or controversy under the Declaratory Judgment Act.

### B. Non-Infringement Under Lanham Act & Common Law

Plaintiffs claim that Victoria's Secret has no right of priority in the Mark because "SEXY LITTLE THINGS" for lingerie is a descriptive term that had not attained secondary meaning by the time Plaintiffs filed their ITU application. Consequently, Plaintiffs assert that they have priority based on their constructive use rights that date back to the filing of their ITU application on September 13, 2004. Victoria's Secret counters that the Mark is suggestive and thus qualifies for trademark protection without proof of secondary meaning. Therefore, Victoria's Secret has priority by virtue of its bona fide use of the Mark in commerce beginning July 28, 2004.

15 U.S.C. Section 1125(a) governs the infringement of non-registered marks such as the

one at issue. In determining infringement under this statute, the court first ascertains whether the mark is protectable. See Bristol Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1039 (2d Cir. 1992). Then, the court assesses whether there is a likelihood of consumer confusion. See id. Where, as here, the marks and goods are nearly identical, however, the focus in the second step shifts from likelihood of confusion to "basic rules of trademark priority" to "determine use and ownership of the mark." Buti v. Impressa Perosa, S.R.L., 935 F. Supp. 458, 468 (S.D.N.Y. 1996).

The elements of unfair competition under New York law are very similar to those for Lanham Act claims under 15 U.S.C. Section 1125(a). See Playtex Prods., Inc. v. Georgia-Pacific Inc., No. 02 Civ. 7848, 2003 WL 21939706, at *7 (S.D.N.Y. Aug. 12, 2003) (Baer, J.). Therefore, my analysis under the Lanham Act also applies to Plaintiffs' common law claim.

### 1. Protectability of the Mark

To merit trademark protection, a mark "must be capable of distinguishing the products it marks from those of others." Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 344 (2d Cir. 1999). As set forth by Judge Friendly in the landmark case of Abercrombie & Fitch Co. v. Hunting World, Inc., the four categories of terms to be considered in determining the protectability of a mark, listed in order of the degree of protection accorded, are (i) generic, (ii) descriptive, (iii) suggestive, and (iv) arbitrary or fanciful. See id., 537 F.2d 4, 9 (2d Cir. 1976). A descriptive term "forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." Id. at 11. In contrast, a suggestive term "requires imagination, thought and perception to reach a conclusion as to the nature of the goods." Id. Suggestive marks are automatically protected because they are inherently distinctive, i.e. "[t]heir intrinsic nature serves to identify a particular source of a product." Lane Capital Mgmt., 192 F.3d at 344. Descriptive marks are not inherently distinctive and may only be protected on a showing of secondary meaning, i.e. that the purchasing public associates the mark with a particular source. See Bristol Myers Squibb, 973 F.2d at 1040.

Classification of a mark is a question of fact. See Lane Capital Mgmt., 192 F.3d at 344. The fact-finder must decide, based on the evidence, whether prospective purchasers would perceive the mark to be suggestive or merely descriptive. Id. at 344-45. A composite mark—one comprising more than one term—must be assessed as a whole and not by its parts. See id. at 346. A leading trademark authority has proposed the following three-part test to distinguish

suggestive from descriptive marks: (i) whether the purchaser must use some imagination to connect the mark to some characteristic of the product; (ii) whether competitors have used the term descriptively or rather as a trademark; and (iii) whether the proposed use would deprive competitors of a way to describe their goods. See No Nonsense Fashions, Inc. v. Consol. Foods Corp., 226 U.S.P.Q. 502, 507 nn. 12-14 (T.T.A.B. 1985) (citing 1 McCarthy, Trademarks and Unfair Competition §§ 11.21A-C (2d ed. 1984) and adopting test).

Applying this three-part test, I find "SEXY LITTLE THINGS" to be suggestive. First, while the term describes the erotically stimulating quality of the trademarked lingerie, it also calls to mind the phrase "sexy little thing" popularly used to refer to attractive lithe young women. Hence, the Mark prompts the purchaser to mentally associate the lingerie with its targeted twenty to thirty year-old consumers. Courts have classified marks that both describe the product and evoke other associations as inherently distinctive. See, e.g., Blisscraft of Hollywood v. United Plastics, Co., 294 F.2d 694, 700 (2d Cir. 1961) ("POLY PITCHER" for polyethylene pitchers is a fanciful mark because it is reminiscent of Molly Pitcher of Revolutionary time); Colonial Stores Inc., 394 F.2d 549, 551 (C.C.P.A. 1968) ("SUGAR & SPICE" for baked goods is distinctive because it not only describes ingredients but recalls pleasant connotations from a well-known nursery rhyme); No-Nonsense Fashions, 226 U.S.P.Q. at 507 ("SHEER ELEGANCE" for pantyhose is suggestive because it both describes sheerness of texture and suggests the "ultimate in elegance"). The second factor is not at issue here as neither party has submitted evidence of competitors' usage of the term. Considering the third factor, however, it is hard to believe that Victoria's Secret's use of the Mark will deprive competitors of ways to describe their lingerie products. Indeed, Victoria's Secret's own descriptions of its lingerie in its catalogues and website illustrate that there are numerous ways to describe provocative underwear.

### 2. Priority

Plaintiffs' alternative contention is that even though the Mark may be suggestive, Victoria's Secret has used it in a descriptive manner, i.e. that Victoria's Secret used the words "sexy little things" to describe its lingerie rather than to identify itself as the source of the goods. Although not crystal clear, the thrust of Plaintiffs' argument appears to be that Victoria's Secret never sold a distinct collection of lingerie under the "SEXY LITTLE THINGS" mark, and hence the term could not have been used as a trademark, but only as a description of various items of

underwear drawn from Victoria's Secret's several sub-brands or from the retailer's general merchandise. Consequently, Victoria's Secret is not entitled to priority in the Mark.

The Second Circuit has held that "the right to exclusive use of a trademark derives from its appropriation and subsequent use in the marketplace." La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1271 (2d Cir. 1974). A single use suffices to prove priority if the proponent demonstrates that his subsequent use was "deliberate and continuous." Id. at 1272. The later filing of an ITU application by another party does not defeat these use-based rights. See Housing & Servs. v. Minton, No. 97 Civ. 2725, 1997 WL 349949, at *3 n.3 (S.D.N.Y. June 24, 1997). The use must, however, be bona fide "use in commerce" as defined in 15 U.S.C. Section 1127. Under this statute, the mark must be "placed in any manner on the goods or their containers or the displays associated therewith or on tags or labels affixed thereto." 15 U.S.C. § 1127(1)(A). Prominent use of a mark in a catalog with a picture and description of the product constitutes a display associated with goods and not mere advertising because of the "point of sale" nature of the display. See Lands' End, Inc. v. Manback, 797 F. Supp. 511, 514 (E.D. Va. 1992). The same principle can reasonably be extended to "point of sale" website displays. Whether or not a term has been used as a trademark must be determined from the perspective of the prospective purchaser. See Cache, Inc. v. M.Z. Berger & Co., No. 99 Civ. 12320, 2001 WL 38283, at *7 n.6 (S.D.N.Y. Jan. 16, 2001).

At trial, Plaintiffs highlighted the delay in the roll-out of the Collection to the Briarwood, Michigan store. They painstakingly pointed to evidence that a few items sold as "SEXY LITTLE THINGS" had previously been sold under one of Victoria's Secret's other trademarks, or as part of a store's general merchandise. Plaintiffs also made much of the fact that in Victoria's Secret's catalogues and on its website, a few items from other trademarked collections were included in pages displaying "SEXY LITTLE THINGS" lingerie. Finally, Plaintiffs argued that the late introduction of sewn-in garment labels bearing the Mark and the delay in indicating on receipts that an item was from the "SEXY LITTLE THINGS" collection proved that there was no "SEXY LITTLE THINGS" collection prior to the filing of their ITU application.

Plaintiffs' determination to ignore the model for the underwear fails to overcome the overwhelming evidence that Victoria's Secret used "SEXY LITTLE THINGS" as a trademark in commerce beginning on July 28, 2004. Commencing on that date, the prominent use of the Mark in four stores on focal wall and table signage, on hangtags, and in window and floor

displays in close association with the lingerie satisfies the "use in commerce" requirement of 15 U.S.C. Section 1127. Similarly, Victoria's Secret's prominent use of the Mark in its catalogues beginning on September 4, 2004, and on its website beginning on or about September 9, 2004, together with pictures and descriptions of the goods meets the Lands' End test, as both mediums were "point of sale" displays. Moreover, Victoria's Secret produced abundant testimony that, dating from July 28, 2004, it continuously used the Mark in association with lingerie sold through its retail stores, catalogues, and online. That Victoria's Secret sold a few garments as part of more than one collection, or that it occasionally included garments from other collections in the catalogue spreads showing "SEXY LITTLE THINGS" lingerie do not detract from such trademark use. Prospective purchasers of underwear, whose perception is determinative on the question of trademark use here, are unlikely to undertake the type of microscopic scrutiny Plaintiffs engaged in to unearth these details for purposes of this litigation. I find that because Victoria's Secret made bona fide trademark use of "SEXY LITTLE THINGS" in commerce before Plaintiffs filed their ITU application, and has continued to use that Mark in commerce, Victoria Secret has acquired priority in the Mark. Consequently, Plaintiffs are not entitled to a declaratory judgment of non-infringement under the Lanham Act or at common law.

### C. Cybersquatting

Plaintiffs contend that a declaration of no-cybersquatting is proper because they registered the domain name www.sexylittlethings.com in good faith and did not know, nor should have known, of Victoria's Secret's use of the Mark. Victoria's Secret responds that this Court has no jurisdiction over this claim because Plaintiffs did not obtain Lanham Act rights through mere registration of their domain name, and there is no actual case or controversy because Victoria's Secret never threatened Plaintiffs with suit for cybersquatting.

I agree with Victoria's Secret that Plaintiffs have failed to establish the existence of an actual case or controversy related to cybersquatting. Victoria's Secret's cease and desist letter may not reasonably be read to threaten Plaintiffs with suit for cybersquatting. The letter made no reference to cybersquatting. Victoria's Secret did demand that Plaintiffs transfer their domain name to it, but this demand was in a separate paragraph and logically unconnected to the sections of the letter that discuss infringement, the only sections that may be read to threaten litigation. See 11/15/2004 Cease and Desist Letter, Ex. A to 03/14/2005 Am. Compl., at 2. Moreover, 15 U.S.C. Section 1125(d)(1)(A), which regulates cybersquatting, requires a showing that the

defendant "has a bad faith intent to profit" from a mark.  Id.  As Plaintiffs claim that they registered the domain name in good faith, they had no reason to fear liability for cybersquatting.  Consequently, Plaintiffs fail to persuade me that they had a real and reasonable apprehension of liability for cybersquatting as required for jurisdiction under the Declaratory Judgment Act, and this Court lacks subject matter jurisdiction over this claim.  See Section III.A.2 supra.

### D.     Tortious/Fraudulent Misrepresentation

Plaintiffs claim that Victoria's Secret representation of its rights to the Mark together with its threats of litigation against Plaintiffs constitute tortious or fraudulent misrepresentation.  Victoria's Secret contends that Plaintiffs have not established any of the elements required for this cause of action.

In order to state a claim for fraudulent misrepresentation under New York law, Plaintiffs must show that:  (i) Victoria's Secret knowingly or recklessly made a material false representation; (ii) Victoria's Secret intended to defraud Plaintiffs thereby; (iii) Plaintiffs reasonably relied on the representation; and (iv) Plaintiffs suffered damages as a result of such reliance.  See Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York, 375 F.3d 168, 186-87 (2d Cir. 2004).

As I concluded at Section III.B.2 supra, it was not unreasonable for Victoria's Secret to believe that it owned the Mark through prior adoption and use in commerce.  Accordingly, Victoria's Secret did not knowingly and recklessly make a material false representation and did not intend to defraud Plaintiffs by claiming that it had rights to the Mark.  Plaintiffs are unable to establish these essential elements of this cause of action.

### E.     Punitive Damages

Plaintiffs seek punitive damages on the ground that Victoria's Secret's cease and desist letter egregiously misrepresented its rights to the Mark and fraudulently attempted to coerce Plaintiffs into abandoning their ITU application and domain name.  Victoria's Secret argues that Plaintiffs fail to meet the high threshold required to prove entitlement to punitive damages.

In New York, punitive damages will only be awarded on a showing of "aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called willful or wanton."  Purgess v. Sharrock, 33 F.3d 134, 143 (2d Cir. 1994).  In light of my conclusion in Section III.D supra, Plaintiffs fall far short of making the required showing.

### F. Costs and Reasonable Attorneys' Fees

Plaintiffs seek to recover the costs of this action and reasonable attorneys' fees based on Victoria's Secret's allegedly tortious actions. In its turn, Victoria's Secret requests an award of costs and attorneys' fees incurred in defending against Plaintiffs' frivolous claims.

In New York, attorneys' fees may only be awarded to a prevailing party if there is an agreement between the parties, a statute, or a court rule that provides for such an award. See Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199 (2d Cir. 2003). In addition, a court has the authority to award attorneys' fees to the prevailing party if the opposing party or its attorneys prosecute or defend in "bad faith, vexatiously, wantonly, or for oppressive reasons." Tri-Star Pictures, Inc. v. Unger, 42 F. Supp. 2d 296, 301 (S.D.N.Y. 1999) (citation omitted).

Because Plaintiffs have not prevailed in this action, there is no need to dwell any further on their claim for costs and attorneys' fees. As to Victoria's Secret's claim, I find that neither the Oscar Gruss nor the Tri-Star tests are met. At trial, Victoria's Secret emphasized that Plaintiffs never bothered to go into a Victoria's Secret store or look in its catalogues after receiving the cease and desist letter in order to ascertain whether Victoria's Secret was using the Mark, despite having easy access to both. While Plaintiffs appear to have demonstrated a singular lack of curiosity in this regard, there is nothing in this record to suggest that they acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." Even if Plaintiffs had conducted this investigation themselves, and seen the various displays of the Mark, they may still have believed that Victoria's Secret's usage was descriptive given that they are not trademark law mavens and that sewn-in garment labels had not yet been introduced when they filed their Complaint. Moreover, Plaintiffs had commissioned two trademark investigations that reported that no one had used the Mark prior to their ITU filing. Even though those reports turned out to have been erroneous, it was not vexatious or wanton for Plaintiffs to have relied on them. Finally, while it might have been precipitate of Plaintiffs to have filed suit without first attempting to communicate with Victoria's Secret's outside counsel, it cannot be said that their response was undertaken in bad faith or for oppressive reasons given the imperious tone of the cease and desist letter.

## IV. CONCLUSION AND ORDER OF JUDGMENT

Plaintiffs are not entitled to a declaratory judgment of non-infringement under the Lanham Act or at common law. Neither are they entitled to a declaratory judgment of no-cybersquatting, a judgment of tortious/fraudulent misrepresentation, an award of punitive damages, nor costs and reasonable attorneys' fees. Consequently, the Complaint must be dismissed in its entirety. Victoria's Secret is not entitled to an award of costs and reasonable attorneys' fees. The Clerk of the Court is instructed to close any open motions and remove this case from my docket.

**SO ORDERED.**
New York, New York
January 10, 2005

U.S.D.J.